MEMORANDUM OF DECISION
On June 10, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Marie H. and Wayne H. to their son, Daniel H. The trial on the termination petition against the parents was held over two days on March 27 and March 28, 2000. For the reasons stated below, the court grants the petition for termination of the parental rights of Marie and Wayne H. because of their failure to rehabilitate themselves as parents of this special needs child.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Marie H., the mother.
Marie H. is now thirty-eight years and had a difficult childhood, as her father was absent from the household. Nonetheless, she graduated from high school and began to be employed sporadically. She was married to Mr. C., the father of her oldest child, Louisa, for a number of years, before their divorce in 1987. Louisa, now seventeen, lives with her father. On January 6, 1990, Marie married Wayne H. Their son, Daniel, had been born earlier on October 6, 1989. The couple lived together until Daniel was about six months old and they have been separated since that time although they are not divorced. Marie H. has been involved in a long-term relationship with Ernst R., with whom she still resides.
2. Wayne H., the father
Wayne H. is forty-seven and now resides in a mobile home with his disabled brother. He has ongoing mental health difficulties. He was psychiatrically hospitalized in 1980 and in 1991, following a delusional incident in which he barricaded his family, including Daniel into the basement of their home. At that time, Daniel was removed from both his mother and father and placed with his maternal grandmother from age seven months until he was two and one half, at which point he was returned to his mother. Daniel remains attached to CT Page 5213 his "meme," as he calls his grandmother, to the present time and she has continued contact with him, although she is not a placement resource for this troubled young boy. Wayne H. receives the assistance of a community case manager, who works with a number of individuals in the community who have mental health issues to help them successfully integrate into the community. Although there have been difficulties in the recent past regarding his medication regimen, the case manager testified that at present, Wayne is compliant with his medications and various mental health appointments.
3. Events prior to the removal of Daniel from the home.
In September 1997, based on referrals and DCF concerns about the chaotic conditions in Marie's home, Daniel's increasingly out of control behavior in school and allegations of physical and sexual abuse, DCF filed a neglect petition. By February 1998, after community referrals about Daniel from the school and the home conditions continued, DCF sought and secured an order of temporary custody on February 2, 1998, which was sustained. At school, Daniel had been in special education classes and his behavior was growing worse. There were also referrals that his mother was not taking him regularly to his therapist and also not providing him with medication that had been prescribed for him. On April 21, 1998, Daniel was adjudicated neglected and committed to the care and custody of DCF. His commitment has been extended since that date.
4. Events following Daniel's removal from the home.
Daniel's condition was such that when he was removed under the order of temporary custody, he was transported directly to the children's psychiatric unit at Natchaug Hospital, where he remained until June 25, 1998. Upon his psychiatric admission, Daniel was diagnosed the following disorders: intermittent explosive disorder, oppositional defiant disorder, impulse control disorder not otherwise specified, anxiety disorder and problems with primary support group. After several months at the unit, Daniel's behaviors had not improved and he had to be physically restrained several times by the staff.
On June 28, 1998, Daniel was placed in the Curtis Home, a residential facility for children. He remained there until March 10, 1999. While at the Curtis Home, Daniel continued to display regression, run-away attempts, and aggression towards the other children in the facility and poor hygiene. He made no progress towards becoming more stable. As the DCF social worker testified, Daniel was not being properly supervised at the Curtis home and several other children there were aggressive towards him. It was an CT Page 5214 unfortunate situation where his care was compromised by others, to say nothing of the extraordinary psychiatric difficulties he himself was having.
On March 10, Daniel was again hospitalized because his condition was deteriorating and he had attempted to kill himself by tying a sheet around his neck. Two days later Daniel was admitted to Riverview Psychiatric Hospital, where he has remained since that time. At Riverview, Daniel was diagnosed as suffering from psychotic disorder, not otherwise specified, and post traumatic stress disorder as well as expressive and receptive language disorder. A Riverview psychiatrist, Dr. Narad, and Daniel's clinician, Dr. Gallenstein, testified at trial at Daniel's progress since he came into their care a year ago. The board certified child psychiatrist testified that:
 "Daniel came to us a very frightened little boy. He had very little trust, he was very careful around adults. In the course of getting to know him, some of this changed."
She noted that when he first came, he wanted very little involvement with people, he would be furious when touched. There were issues about his unwillingness to wear clothes, cleanliness, wetting his bed and wiping the mucous from his nose on himself and things around him. Over time, his fears came out, she noted. He had terrible dreams and had auditory and visual hallucinations. She noted his fears were "beyond what children normally do. They were about danger, dinosaurs cannibalizing people and they would say to him `I am going to get you, eat you or take you over.'" His clinician noted that she worked with Daniel formally twice a week, but also saw him during other times at the hospital. She stated that Daniel has not revealed much concerning his home life and has said "I do not want to remember anything before the age of eight." Nonetheless, his condition has improved and he has been stabilized there so that he no longer requires restraining. She and the psychiatrist believe that he is ready for placement in a professional foster home, a less restrictive setting.
5. Daniel H.
Daniel is now ten years old. He will be eleven in October. Dr. Gallenstein in her testimony stated that Daniel is a special needs child. He has an "inability to verbalize his needs so that he is not destructive or aggressive. He has difficulties with thinking, difficulties in trusting other people and difficulties with other children. He has difficulties in school. . . . he has a tactile sensitivity and writing and putting his thought on paper are very CT Page 5215 difficult and frustrating for him. There are a number of needs which have to be met," she concluded. She noted that it took a long time for Daniel to trust her. In therapy, he would often say to her "I do not want to remember" and then stare off into space.
The few things he did report about his life with his mother were that he could not remember any birthdays. He was worried about this, she noted and could only recall his fifth birthday, when he received a blanket with horses on it from his mother. He recalled watching scary shows with his mother. He stated that "We were very poor and we lived in a car." He did seem to enjoy the times that he camped out in the summer. She noted that he was scared of snakes and that he reported a friend of his mother's had a snake and they watched it consume live animals. She noted that he had an anxious attachment to his mother and that Daniel worries about her, whether she is going to come to visit him, whether she is moving and whether she is all right. Most telling was that when he first came into treatment with her, he was sad and did not feel that he was important to anyone. When he spoke of this, she noted that "his voice was serious, his eyes turned down and he was tearful. He stated that he should just be dead and he was not special to anyone." She said he thought of himself as a worthless person.
Daniel also has problems with reality testing, she noted. She testified that there are "kids who have lived in such chaos that their reality testing becomes blurred. This results in disorganized thinking and logical thoughts become distorted, tangential and confused." While she admitted that Daniel had not revealed a lot of detail about his past home life, these were issues that he struggled with. Dr. Gallenstein testified that in February of this year, she wrote a letter, which took her some weeks to write, in which she struggled with whether or not visitation should continue between Daniel and his parents. In her letter, she chronicled his severe problems and the difficulties he has had even at Riverview in attending school, but supported continued contact with his biological parents.[2] At trial, she had changed her opinion and concluded that contact with his parents is not beneficial to him. She believes that termination of his parents' rights to him would benefit him. Dr. Gallenstein stated she is now of the opinion that Daniel cannot deal with his post-traumatic stress disorder issues while maintaining contact with his parents. She noted that when there was no visitation, he was less explosive and more able to trust other people. She also noted that Daniel's psychosis is treated with medication. Further she stated that the diagnosis points to a partial neurological origin for his condition. CT Page 5216
Dr. Narad, on the other hand, was unequivocal in her opinion that visitation should have ended far earlier than it did and believed that a termination should have been entered earlier as well. She stated that she has observed the symptoms of recurrent post traumatic stress disorder in Daniel. She noted that "all the staff brace themselves [for the day visitation tales place] for Dan. It usually interferes with his concentration at school." She noted that "it is the unpredictability of visitation that troubles him. He does not trust that it will happen." She noted that Daniel feels responsible for his parents. She believed that he "feels helpless. If he were the omnipotent and all-powerful big boy he would like to be, he could fix things. This is a burden that is very difficult for a young child. . . . The work being done with him is to teach him that he is not as bad as he believes and that he is not responsible for their welfare." She concluded "it is important that he have some normalization of his childhood prior to his going into adolescence."
Riverview has begun the process of locating a professional foster home for Daniel, but only the first contact has been made. Dr. Gallenstein noted that initially when she mentioned this to Daniel last July he was not ready to reach out to another family. Last December, however, she stated that he told her he wanted to begin the process. Dr. Narad believes that there is some hunger on his part for a family to care for him. Daniel has confided to Dr. Gallenstein that "I "do not think my mom and dad can take care of me." The plan is to transition him slowly into the professional foster family and if there is some difficulty, to begin the process anew with another family. He is expected to remain at Riverview Hospital until such a placement can be achieved for him.
6. Visitation.
The DCF social worker and the social services assistant testified about the supervised visitation, which has taken place between Daniel and his biological parents. The assistant drove each of the parents to the visitation and then supervised most of the sessions. As to Wayne H., he noted that Daniel's father "does not address Danny as a child. You need to be on his level with his special needs." He noted that he has had to interrupt several visits because "Wayne was going into areas, which Danny cannot understand, particularly religious issues. When this happens, Danny puts on a blank face and goes into a shell." Another area concerned clothing, which as noted was a difficult area for Daniel. His father brought some pants and a shirt, each with buttons. His father tried to get him to put on the pants and the shirt and Danny responded that he did not like buttons. He told his father "I do not want to wear them and I hope that you are CT Page 5217 not mad at me. There is buttons and I do not like buttons." This had happened once before when his father brought shoes which were too tight and had laces. Danny refused to put them on as he did not like the laces.
On another occasion, his father brought some fruit, dental floss and a religious pamphlet. He was apparently concerned that Daniel was not taking care of his teeth properly. Up until that point the visit, the assistant noted, was ok. After that, Wayne told Daniel that there were other uses for dental floss as it was very sterile and he noted that he used the dental floss to cut his sister's umbilical cord. Daniel did not understand and then looked puzzled. Then he was nervous and scared and he could not understand why this would be done to his sister. Wayne H. also talked to Daniel about coming home. He would ask him "Don't you want to live with your sister." The assistant noted that Daniel seemed to shut down. "He goes into a shell and answers whatever he think the father wants to hear. He usually stops what he is doing . . . his body language is not of someone who is comfortable with the question." When questioned about how frequent such interactions are, the assistant noted that they happen more than half of the time. "Whenever the father goes into a situation where Danny is uncomfortable, Danny shuts down. This is not based on where Danny is, but where Dad is." He concluded:
 "that father has a problem curtailing information to the child that he is not supposed to receive and quite often has his own agenda. It is adult based and the child has a hard time interpreting some of the things Dad feels are important. He does not bring it to Danny's level or ability very well at all."
The DCF social worker echoed these sentiments. On occasion she also supervised the visits at Riverview Hospital. "Wayne does not present with an ability to understand where Dan is at with a number of issues including religion. Danny had a difficult time understanding what his father had to say." She noted in the addendum to the social study that "Mr. H. is observed to preach and quote from the Bible, references Satan, serpents and the Garden of Eden. Wayne H. was informed of the negative impact his preaching has Daniel and he does not understand the emotional effect on his son."[3]
The social worker also heard comments from Wayne H. to his son about Daniel being able to go home. His father felt that Danny needed to go home as he was acting somewhat feminine. She testified that "even though the parents were visiting for quite a period of time, things never progressed toward more frequent visits or family CT Page 5218 therapy. Part of the idea behind the supervision was to continually assess whether those visits should increase. Neither parent was able to display appropriate parenting during the one hour supervised visits that they had." Therefore they were not expanded to provide family therapy and further reunification efforts.
Wayne H. testified at trial on his own behalf. In his opinion, the visits went well. He noted that he gives Daniel special attention. He also was of the view that Daniel shared some of the problems he had experienced as a young child due to his mental illness and that he could help him with these issues. It was apparent from his comments that his understanding of the serious nature of Daniel's problems as well as the contributions his own actions made to those problems was minimal.
The visitation Marie H. had with Daniel revealed its own set of different problems. The social worker assistant noted that there have been problems around toys. Daniel will ask for a toy from home and his mother will say "I am saving this for you." This happened frequently, at least ten times and she would not bring the requested toys to her son. On one recent occasion, he noted that she spoke of getting him a Nintendo game. She asked what color he wanted and he was very excited when the next visit came. He then asked her about the game during the next visit and she stated "well, I am trying" and quickly changed the subject. Danny became very withdrawn during this visit. Dr. Gallenstein also noted the difficulties around toys. She stated that "his mother holds a carrot to him and then it does not happen." Sometimes, when she does bring things, she does not permit him to play with them, she wants to keep them safe. She noted "this is very upsetting to Daniel as he has so few things to call his own." The social worker also mentioned an incident when Marie brought a "Furbee" toy for him and explained how you could tell it was a real one and that it was a collector's item. When Marie tried to remove it from Daniel, the social worker intervened and returned it for him to keep.
Marie also speaks about moving, and this bothers Daniel. "He worries that something is going wrong with the move and he would shut down as well." On one occasion, Marie spoke about a move, she also told him not to tell his father. Immediately Daniel shut down, the social services assistant testified. At times, the assistant noted, when Marie and Daniel play games, she is very competitive. On one such occasion, Marie told him at the end of game that he only won because she let him do so, a comment that upset him. He became frustrated and then he switched to something else.
Both the social service assistant and the social worker testified CT Page 5219 that Daniel does not ask about his parents nor does he ask to go home. Marie, however, testified that every time she visited, Daniel asked if he could come home with her. The court concludes, from all the testimony that this was not so. From this testimony the court also infers her mistaken belief is evidence of the issues that Daniel must have had around reality testing while at home. His mother is not an accurate historian of the events that happen in her life. Therefore, it follows that when Daniel was in the home, she would not have relayed events to Daniel accurately, further leading to a deterioration of his condition.
The social worker who supervised visits approximately once a month testified that Marie was able, unlike his father; to drop down to Daniel's level, she would become quite child-like. She was unable to set limits for him and that the relationship the social worker observed was more like a friend to a friend than a mother to a son. She was of the opinion that things never progressed in the supervised visitation sessions and neither parent was able to display appropriate parenting. The court so concludes from the clear and convincing evidence.
7. Compliance with Court Expectations.
Neither of the parents was able to comply with the expectations set for them by the court, the social worker testified. Marie only took one parenting course offered by Natchaug hospital, about which she did not provide information or releases in a timely fashion so that its content could be reviewed. She did not keep her whereabouts known to DCF and did not permit unannounced or announced visits. She did not contact DCF to inquire about Daniel nor did she seek to speak to the professionals at Riverview. It was clear from Marie's own testimony that in general she was hostile to DCF and only made token attempts to seek services and to engage with them. The social worker testified that she attempted some visits at Marie's home in 1998 and Marie was never there. She also admitted that family therapy was never offered to Marie after Daniel's removal from the home. She noted that this would have been the next step had the parent's visitation demonstrated improvements. The worker noted that individual counseling was also expected of Marie, although this was not checked on the expectations form., but referrals had been made. She also stated that Marie was not consistent with visitation. She testified that Marie was not involved in services and that Daniel was not adequately stabilized to warrant family therapy.
Counsel for the mother argued that Marie H. complied with the expectations set for her and that Marie relied upon those written CT Page 5220 expectations. He maintained that she took the parenting course required of her and that individual counseling was not an item expected. The court finds from the clear and convincing evidence to the contrary that Marie did not comply with the expectations. As the court has noted in other contexts, compliance is not just attendance, but evidencing understanding and learning that promote the changes necessary to assist in parenting a child. There was no evidence to support such a conclusion. In fact, Marie's own testimony demonstrates palpably her lack of understanding of the complex parenting issues the care of her special needs child presents. The visitation sessions were also demonstrable proof of a failure to comprehend what was required for her son.
Wayne H. has complied in part with the expectations set for him by the court. While there were some issues about the medications he was taking and a possible overdose, it is apparent that this issue has been resolved for the present. Visitation has been consistent in the last year, but was less so earlier in this case. While it may be there has been some compliance with the expectations, in this case such compliance clearly was not adequate. The court concludes from the clear and convincing testimony that Wayne H. has not been able to deal with his child appropriately. His circumstances are such that he is not in a position to parent his child and it does not appear that it would be likely that he would be able to accomplish the necessary changes soon.
The services to which the parents were referred included the parent aide program and individual and family therapy at United Services, although after Daniel's removal as noted, family therapy was not continued because of the family's lack of progress. Daniel himself received extensive services. Each of the parents received well-coordinated transportation assistance to the extensive visitation that each was able to enjoy with their son.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). Our Appellate court has stated: CT Page 5221
 ". . . the statutes imposed upon the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the family. The word reasonable (emphases added) is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." In re Tabitha T., 51 Conn. App. 596, [51 Conn. App. 595], 600, 722 A.2d 1232 (1999).
The court finds, as noted above, that the reunification efforts made for both parents were reasonable under all the circumstances. The court so concludes from the clear and convincing evidence.
2. Adjudicatory Findings
On April 21, 1998, Daniel was adjudicated neglected. He has remained committed to the care and custody of DCF since that time. The court further finds, by clear and convincing evidence, that as of June 10, 1999, the date of the filing of the termination petition, Marie H. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112
(c)(3)(B). "`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986), see also; In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795 (1984). She has not participated in individual therapy, she did not seek to understand her child's special needs, and whatever parenting training she received demonstrably did not assist her in becoming able to appropriately relate to Daniel, even for one hour a week under supervised conditions.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722
(1989), In re Hector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Marie's conduct prior to the filing of the petition, but also her conduct after that time. In this case, this was a period of less than one year, during which time CT Page 5222 Marie made no progress. The court concludes Marie's lack of rehabilitation continues to the present time and there is no prospect that she will be rehabilitated within the foreseeable future. Given her resistance to treatment, her failure to educate herself regarding Daniel's needs and her evident inability to comprehend those needs, the court finds from the clear and convincing evidence, she will not become rehabilitated soon, if ever. Daniel has clear permanency needs that must be met soon. The court concludes from the clear and convincing evidence that Marie cannot meet such needs on his behalf within any reasonable time frame.
Wayne H. has also not rehabilitated as demonstrated by the clear and convincing evidence. His own preoccupations do not permit him to be able to relate to his son in an appropriate way. As of June 10, 1999, Wayne H. had not demonstrated any progress nor has such progress been shown since that date. He is not now in a position to care for the child, but requests more time to put himself into such a position. While the court does not doubt his sincere feelings for his son, Daniel requires permanency and requires it soon, if he is to have any chance of some normalized childhood experiences prior to his adolescence. He does not have any more time for his father to improve his situation. For those reasons, the court finds that Wayne H. has failed to rehabilitate within a reasonable time, given the age and needs of his son.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. The services include many services to benefit Daniel and referrals for Marie and Wayne H., the biological parents. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Marie and Wayne and neither was able to fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year CT Page 5223 and with whom the child has developed significant emotional ties. Daniel has developed ties to his caretakers at Riverview Hospital, who cannot be his permanent caretakers. It is expected that he will be able to develop ties to an appropriate foster family. His ties to his parents are anxious and negative, although he is aware of their identities.
5) Finding regarding the age of the child: Daniel is ten years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that neither Marie nor Wayne H. have made the changes necessary to accommodate the care and nurturing of this child. While in the last year, each has visited Daniel more regularly, this fact, by itself, cannot overcome the other significant parental deficits and the greater than normal parenting skills required to deal with Daniel's special needs.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps to encourage Marie and Wayne H. to have a meaningful relationship with Daniel, which they have been unable to accomplish.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence that neither of the parents will be able to care for Daniel in the foreseeable future. The court concludes, from the clear and convincing testimony, that it is in Daniel's best interests to be permitted to have permanency and stability in his life. The court further finds that adoption by a professional foster care family that understands and can accommodate his special needs is the avenue most likely to accomplish this result for Daniel. The court also finds that termination of his parents' rights to him will make his ultimate adoption more probable. Towards that end, the court concludes that it is in Daniel's best interests that his parents' rights to him to be terminated. Our courts have noted the "deleterious effect of CT Page 5224 prolonged temporary care of abused and neglected children." In reJuvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ."In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992).
The court therefore orders that a termination of parental rights enter with respect to Marie H. and Wayne H. The court further orders that a permanency plan for Daniel be submitted within sixty days. A review plan for the child shall be filed in accordance with state and federal law.
___________________ Barbara M. Quinn, Presiding Judge Child Protection Session